*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0738**

In the Matter of the Civil Commitment of: Benjamin A. Ebert.

**Filed October 6, 2025
Affirmed
Bentley, Judge**

Hennepin County District Court
File No. 27-MH-PR-25-344

Gabe Monson, Hennepin County Adult Representation Services, Minneapolis, Minnesota (for appellant Benjamin Ebert)

Mary F. Moriarty, Hennepin County Attorney, Brittany D. Lawonn, Senior Assistant County Attorney, Minneapolis, Minnesota (for respondent North Memorial Health Care / Hennepin County)

Considered and decided by Larson, Presiding Judge; Bentley, Judge; and Kirk, Judge.[*]

**NONPRECEDENTIAL OPINION**

**BENTLEY**, Judge

On appeal from a commitment as a person who poses a risk of harm because of mental illness, appellant Benjamin A. Ebert argues that the district court erred by finding that autism spectrum disorder (ASD) and attention deficit/hyperactivity disorder (ADHD) are substantial psychiatric disorders under the commitment statute, Minn. Stat. § 253B.02,

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

subd. 17a(a) (2024). Because the district court also based its decision on a third diagnosis that Ebert does not dispute is a substantial psychiatric disorder, we affirm.

## FACTS

On March 29, 2025, Ebert's mother called Hennepin County Community Outreach for Psychiatric Emergencies (COPE) to report that Ebert had "destroyed his apartment" and had been sending "bizarre" text messages. When COPE responders arrived at Ebert's apartment, they observed that Ebert was intoxicated and "speaking nonsensically," and they could not engage him in conversation. The COPE responders transported Ebert to the hospital, where a blood sample showed his alcohol concentration was 0.308. At the hospital, Ebert said that he had been suicidal, attempted to overdose, and planned to kill himself. He also reported that he had been hospitalized in Duluth under similar circumstances in June 2024, when he attempted suicide through drinking and overdose. During that hospitalization, he admitted to three prior suicide attempts.

Respondent Hennepin County petitioned to commit Ebert as a person who is mentally ill and in need of hospitalization, and the district court appointed Dr. Casey Boland to examine Ebert and prepare a report. In her report, Dr. Boland opined that civil commitment is the least-restrictive, appropriate treatment for Ebert. Based on her review of Ebert's records, Dr. Boland did not believe that Ebert would follow through with treatment voluntarily. "[R]ecords indicated [Ebert] disengaged from treatment when he faced . . . barriers, rather than seeking alternative treatment." Dr. Boland was concerned about Ebert's disengagement because he currently posed a "significant risk of harm to

himself" and had reported that "he did not use his identified coping mechanisms prior to his current admission because he wanted to die."

The district court held a hearing on the commitment petition on April 10, 2025. At the hearing, the court took judicial notice of the examiner's report and received medical records relating to Ebert's current and June 2024 hospitalizations. Ebert testified about his mental health history, diagnoses, and treatment needs. He stated that prior hospital stays have been challenging for him for several reasons, including his sensory issues. Ebert's attorney asked the district court to either deny the petition or continue the matter for dismissal so that Ebert has a chance to seek treatment in the community.

The district court filed an order on April 14, 2025, committing Ebert as a person who poses a risk of harm because of mental illness. The district court found that "Ebert is ill with major depressive disorder, ADHD, and autism spectrum disorder—which is a substantial psychiatric disorder of thought, mood, and perception, which grossly impairs his judgment, behavior, capacity to recognize reality, and ability to reason or understand." Relying on Dr. Boland's report and the medical records, the district court found that Ebert "poses a substantial likelihood of physical harm to himself" due to his mental illness. Because of Ebert's "prior disengagement from treatment in similar settings" and "the seriousness of recent safety concerns," the district court was persuaded that he "would benefit from oversight to ensure he receives appropriate ongoing care." And although the district court considered Ebert's testimony that he "no longer intends to harm himself and would voluntarily engage in treatment that would be able to accommodate his sensory and social needs," it did not credit that testimony because of Ebert's past struggles to "ward

3

against him being a danger, particularly to himself." As a result, the district court found that the "least restrictive, appropriate, available placement" was civil commitment.

Ebert appeals.

## DECISION

Ebert argues that the district court erred when it stated that ASD and ADHD are substantial psychiatric disorders under the commitment statute. The county argues that the district court's comment regarding ASD and ADHD is not relevant because, based on the evidence indicating that Ebert had major depressive disorder, the district court did not err in concluding that Ebert had a substantial psychiatric disorder.

When reviewing an order of commitment, an appellate court examines whether the district court complied with the commitment statute and whether the district court's findings support its conclusions of law. *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). Appellate courts review the district court's factual findings for clear error, "considering the record in the light most favorable to the findings of fact." *In re Civ. Commitment of Breault*, 942 N.W.2d 368, 378 (Minn. App. 2020) (quotation omitted). "[F]indings are clearly erroneous when they are manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted). Appellate courts "review de novo whether there is clear and convincing evidence in the record to support the district court's conclusion" that an individual's circumstances require commitment. *In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003).

4

A district court shall civilly commit an individual "[i]f the court finds by clear and convincing evidence that the proposed patient is a person who poses a risk of harm due to mental illness" and there is "no suitable alternative to judicial commitment." Minn. Stat. § 253B.09, subd. 1(a) (2024). A person poses a risk of harm because of mental illness if they have "an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory"; the disorder "grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand" and "is manifested by instances of grossly disturbed behavior or faulty perceptions"; and, because of their condition, the person "poses a substantial likelihood of physical harm to self or others." Minn. Stat. § 253B.02, subd. 17a(a) (2024). The commitment statute does not list any specific disorders that qualify as a mental illness, but we have concluded that "[a]n individual who suffers from an antisocial personality disorder, but not a major mental illness, may not be a 'mentally ill person'" as that term was defined under a prior version of the statute. *In re El-Rashad*, 411 N.W.2d 567, 569 (Minn. App. 1987).

Ebert challenges the district court's findings relating to his mental illness, that "Ebert is ill with major depressive disorder, ADHD, and autism spectrum disorder—which is a substantial psychiatric disorder of thought, mood, and perception, which grossly impairs his judgment, behavior, capacity to recognize reality, and ability to reason or understand." Ebert reads this as the district court determining that major depressive disorder, ADHD, and ASD each meet "the mental illness definition in the statute." He suggests that public policy considerations weigh against committing people with neurodevelopmental disorders such as ASD and ADHD because they may be placed in

5

settings that do not align with their treatment needs. Ebert therefore asks us to remand "for additional findings concerning [his] mental illness diagnoses."

As an initial point, it is not clear that Ebert's reading of the district court's order is the right one. Another reasonable interpretation of the order is that the district court determined that Ebert's diagnoses of major depressive disorder, ADHD, and ASD *together* constitute a "substantial psychiatric disorder." After all, the district court listed the three diagnoses and then used the singular verb "is" to describe them as a substantial psychiatric disorder.

Even assuming without deciding that the district court identified ASD and ADHD as substantial psychiatric disorders and erred in that respect, Ebert has not shown that he was prejudiced by any such error. "If an appellant shows that the district court erred, the mere existence of that error is, by itself, insufficient to require a grant of relief; the appellant must also show that the error was prejudicial." *In re Civ. Commitment of Turner*, 950 N.W.2d 303, 309 (Minn. App. 2020). Ebert does not challenge the finding that he has major depressive disorder, he concedes that "[m]ajor depressive disorder may be a basis for civil commitment," and he notes that a person with a neurodevelopmental disorder and another disorder (i.e., schizophrenia) could be committed if the statutory criteria are otherwise met. Indeed, our caselaw instructs that a district court does not reversibly err by making "extraneous" findings about a nonqualifying disorder when the record supports its determination that a person has a substantial psychiatric disorder. *El-Rashad*, 411 N.W.2d at 569-70 ("The findings referring to El-Rashad's possible personality disorder are extraneous to our conclusion that the trial court's finding that El-Rashad is a mentally ill

6

person is not clearly erroneous."). Here, the record supports the district court's conclusion that Ebert had a substantial psychiatric disorder and we discern no basis to conclude that the district court would have reached a different decision had it not identified ASD and ADHD as substantial psychiatric disorders.

Ebert requests that we remand the case to the district court for additional findings that disaggregate its findings with respect to major depressive disorder, ASD, and ADHD. But nothing in the statute requires the district court to make those express findings or to explain on the record the extent to which a risk of harm is due to various diagnoses, so long as at least one diagnosis constitutes a substantial psychiatric disorder. *See* Minn. Stat. § 253B.02, subd. 17a (2024); *see also In re Civ. Commitment of Suchan*, No. A11-1415, 2012 WL 686187, at *4 (Minn. App. Mar. 5, 2012) (concluding that "the statute does not require the district court to specify a diagnosis").[1] "[W]hen a requirement is not present in a statute, we will not 'read [it] into an unambiguous statute under the guise of statutory interpretation.'" *Turner*, 950 N.W.2d at 308-09 (quoting *Breault*, 942 N.W.2d at 377).

Ebert also seems to argue that the district court should have considered his ASD in determining his treatment placement. He asks that we consider a nonprecedential opinion of this court in which "the dissent discussed the appellant's possible diagnosis of [ASD] as one of the many reasons that civil commitment to [the Minnesota Sex Offender Program] was not appropriate." *See In re Commitment of Eischens*, No. A14–0013, 2014 WL 2808060, at *7 (Minn. App. Jun. 23, 2014) (Randall, J. dissenting). But the dissent in

---

[1] We cite this nonprecedential opinion for its persuasive value only, and we note that it is not binding authority. Minn. R. Civ. App. P. 136.01, subd. 1(c).

*Eischens* does not persuade us that the district court erred here. First, the dissent does not assert, as Ebert seems to suggest, that Eischens's ASD was a reason why a less-restrictive placement was appropriate in that case. *Id.* at \*6-11. Rather, the dissent contends that Eischens's possible ASD diagnosis could partially explain why he "acted out sexually" when he was 14 years old, which would make civil commitment for that conduct especially egregious. *Id.* at \*7. Second, the record shows that the district court here considered Ebert's ASD in determining whether there was a less-restrictive alternative to civil commitment. Specifically, the district court considered Ebert's testimony that he "would voluntarily engage in treatment that would be able to accommodate his sensory and social needs." But the district court did not find Ebert's testimony credible because "[h]is best intentions have not been able to ward against him being a danger, particularly to himself." We defer to the district court's credibility determinations. *Kenney*, 963 N.W.2d at 221-22.

In sum, even assuming that the district court erred in determining that ASD and ADHD alone are substantial psychiatric disorders, Ebert has not established that he is entitled to appellate relief. And the district court did not clearly err in finding that civil commitment is the least-restrictive treatment program that can meet Ebert's treatment needs.

**Affirmed.**